UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| KEVIN SMITH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:13-CV-509 WL |
| | ) | |
| SUPERINTENDENT, | ) | |
| | ) | |
| Respondent. | ) | |

OPINION AND ORDER

Kevin Smith, a *pro se* prisoner, is serving a 58-year aggregate sentence for rape, criminal confinement, criminal deviate conduct, and sexual battery offenses committed in Lake County, Indiana. *State v. Smith*, No. 45G01-0508-FA-0041. He filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (DE 1.)

I.     BACKGROUND

In deciding the petition, the court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Smith's burden to rebut this presumption with clear and convincing evidence. *Id*. On post-conviction review, the Indiana Court of Appeals set forth the facts underlying this case as follows:

> Shortly before 1:00 in the afternoon on August 15, 2005, eighteen-year-old M.S. was walking past Smith's home on her way to a friend's house. Smith, a thirty-two-year-old whom M.S. had met on several past occasions, was on the front porch of his home and spoke to M.S. He indicated that his girlfriend could give her a ride, as she had on prior occasions, if she came inside the house and waited. M.S. agreed and entered the home.
>
> Once inside the home, Smith approached M.S. and asked her if she wanted to have sex. When M.S. declined and tried to exit, Smith held a knife to her throat and told her to cooperate. Smith forced her into his bedroom and threw her onto the bed. He climbed on top of her and began to choke her when she struggled. Smith forced M.S.

to perform fellatio on him for ten to fifteen minutes. He then removed her pants and tampon and had intercourse with her for about five or ten more minutes.

After stopping, Smith forced M.S. into the shower and instructed her to thoroughly clean herself. He provided her with a new tampon and then took her back into his bedroom and allowed her to dress. Smith ordered M.S. to lie on her stomach on the bed and then he bound her hands and feet together with rope behind her back. When M.S. asked what he was planning to do with her, Smith replied that he did not know yet. He held a cigarette for M.S. to smoke and talked to her for a brief period of time. He then lifted her to the floor between the bed and the wall and tied her to the bed frame. He also placed duct tape over her mouth, indicating that he was going to leave to get money and a vehicle.

Smith left the house, but returned within five minutes. At that time, M.S. heard the voice of Smith's seven-year-old son. When she tried to yell, Smith choked her again. Smith then left the residence with his son. At some point, M.S. was able to loosen the ties binding her feet and free herself from the bed. M.S. exited the house shortly before 4:00, with her wrists still bound, and frantically flagged down Jon Metz, a passing motorist. When Metz stopped, M.S. entered the passenger side of his vehicle and asked for help, indicating that she had been raped. M.S., who was carrying a bundle of rope and still bound, was hysterical, shaking, and crying. Metz pulled into a driveway a few houses down from Smith's and called 911. While Metz was making the call, a truck sped into the driveway at Smith's residence. M.S. cowered in her seat and pointed out the truck to Metz. Metz immediately drove away and took M.S. to a nearby business to meet police. A rape examination was later performed on M.S., and Smith's DNA was present in vaginal samples taken from her. Visible injuries to M.S.'s wrists, ankles, and neck were also documented.

On August 16, 2005, the State charged Smith with class A felony rape, class B felony criminal deviate conduct, class B felony criminal confinement, class C felony sexual battery, and class D felony criminal confinement. Smith left the state with his son following the incident. He returned and surrendered to police on August 23. A jury trial was held between May 22 and May 26, 2006. Smith testified on his own behalf and indicated that he had known M.S. before the alleged rape and that they had had seven to nine consensual sexual encounters between January and August 2005. He testified that on the day in question he had consensual intercourse with M.S. sometime before 1:00. According to Smith, his condom broke during sex and they both became scared that she might get pregnant. Thereafter, M.S. asked for Oxycontin and left angry when Smith refused to give her a pill without money. Smith testified that M.S. left around 1:00 and that he left around 1:30 to pick up his son, run errands, and stop at two different residences. Shortly after being warned that police came by his house around 4:30, Smith fled to Virginia with his son.

*Smith v. State*, No. 45A04-1205-PC-264, slip op. at *2-4 (Ind. Ct. App. Feb. 22, 2013). The jury found Smith guilty on all counts. *Id.* at *4. He was sentenced to an aggregate term of 58 years in prison. *Id.*

He appealed, presenting one issue to the Indiana Court of Appeals: that the trial court erred under state law by advising the jury that he had violated a pretrial discovery order. (DE 8-4 at 7.) The state appellate court affirmed. *Smith v. State*, No. 45A03-0608-CR-360 (Ind. Ct. App. Jun. 22, 2007). Smith filed a *pro se* petition to transfer with the Indiana Supreme Court raising this same claim. (DE 8-7.) His petition was denied. (DE 8-3 at 3.) He did not seek review in the U.S. Supreme Court. (DE 1 at 1.)

In March 2008, Smith filed a *pro se* petition for state post-conviction relief. *Smith*, No. 45A04-1205-PC-264, slip op. at *5. Following an evidentiary hearing at which Smith presented the testimony of several witnesses, the petition was denied. *Id.* He appealed, asserting claims of ineffective assistance of counsel on various grounds. *Id.* at *7-13. First, he argued that trial counsel was ineffective in failing to conduct a thorough investigation, failing to pursue an alibi defense, and failing to adequately communicate with him or provide him any legal representation during trial. *Id.* at *7-10. The appellate court found that Smith failed to establish his counsel was ineffective on any of these grounds. *Id.* Smith also argued that trial counsel was ineffective in failing to object to certain comments by the prosecutor during trial, but the appellate court found this argument waived due to Smith's failure to develop a cogent argument in support of this claim. *Id.* at *10-11. Finally, Smith claimed that his appellate counsel was ineffective. *Id.* at *12. The court concluded that Smith failed to establish deficient performance or prejudice in connection with this claim. *Id.* at *12-13. Accordingly, the court affirmed the denial of post-

conviction relief. *Id.* at *13. Smith sought transfer to the Indiana Supreme Court, raising only his claims pertaining to ineffectiveness of trial counsel. (DE 8-12.) The Indiana Supreme Court denied transfer. (DE 8-8 at 4.) Smith did not seek review in the U.S. Supreme Court. (DE 1 at 2.)

Thereafter, Smith filed a federal habeas petition raising four claims based on ineffective assistance of trial counsel. He claims as follows: (1) counsel failed to conduct a proper pretrial investigation; (2) counsel failed to investigate and pursue other stronger defense theories; (3) counsel failed to communicate with him and adequately defend him during trial; and (4) counsel failed to object to various comments by the prosecutor. (DE 1 at 3-7.)

II.  ANALYSIS

Smith's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court may grant an application for habeas relief only if it meets the stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, a federal habeas court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is "contrary to" federal law if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court, or reaches an opposite result in a case involving facts materially indistinguishable from relevant U.S. Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from U.S. Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively" unreasonable. *Id.* In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, —U.S.—, 131 S. Ct. 770, 786 (2011). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

Before considering the merits of a claim, the court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). Interests of comity require that the state courts be given the first opportunity to address and correct violations of their prisoner's federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claims in one complete round of state review, including with the state court of last resort. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004); *Boerckel*, 526 U.S. at 845.

5

This requires him to raise his claim "at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Lewis*, 390 F.3d at 1025-26. The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a claim when: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state law procedural ground; or (2) the claim was not presented to the state courts and it is clear those courts would now find the claim procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). When a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the claim is procedurally defaulted. *Boerckel*, 526 U.S. at 853-54.

A habeas petitioner can overcome a procedural default by showing both cause for failing to present his claims and a resulting prejudice. *McQuiggen v. Perkins*, —U.S.—, 133 S. Ct. 1924, 1931-33 (2013); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). Cause sufficient to excuse a procedural default is defined as "some objective factor external to the defense" which prevented the petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Routine matters such as a petitioner's *pro se* status or lack of knowledge of the law do not establish cause to excuse a procedural default. *Smith v. McKee*, 598 F.3d 374, 385 (7th Cir. 2010); *Harris v. McAdory*, 334 F.3d 665, 669 (7th Cir. 2003).

Alternatively, a habeas petitioner can also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006). To meet this extraordinary exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A petitioner who

asserts actual innocence "must *demonstrate* innocence; the burden is his, not the state's[.]" *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) (emphasis in original). Furthermore, actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To support a claim of actual innocence the petitioner must come forward with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," *Id.*, and must show that "in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 537. This is a difficult standard to meet, and such claims are "rarely successful." *Schlup*, 513 U.S. at 324.

      A. Motion for Appointment of Counsel

As a preliminary matter, Smith moves for the appointment of counsel to represent him in this case. (DE 16.) Unlike a criminal defendant, an indigent civil litigant does not have a right to counsel at public expense. *See Resendez v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011) ("It is . . . well established that a criminal defendant enjoys [a] right to counsel through his first appeal . . . but that, once the direct appeal has been decided, the right to counsel no longer applies."); *Jackson v. County of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992) (indigent civil litigants have no constitutional or statutory right to be represented by counsel in federal court). A state prisoner pursuing federal habeas relief is entitled to counsel only when he is under a death sentence, which Smith is not. *See* 18 U.S.C. § 3599(a)(2); *McFarland v. Scott*, 512 U.S. 849, 855 (1994). Counsel must also be appointed in a habeas case when an evidentiary hearing is necessary to resolve the petition. RULE 8(C) of the RULES GOVERNING SECTION 2254 CASES. Here, Smith has not requested an evidentiary hearing, nor has this court determined that one is necessary or

7

appropriate under the applicable law. *See* 28 U.S.C. § 2254(e)(2); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400-02 (2011); *Toliver v. Pollard*, 688 F.3d 853, 859-60 (7th Cir. 2012).

Therefore, whether to appoint counsel is purely a discretionary matter. *See* 18 U.S.C. § 3006A(a)(2)(B) ( "Whenever . . . the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under section 2241, 2254, or 2255 of title 28."); *see also Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997); *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007). The court will abuse its discretion in declining to appoint counsel only "if, given the difficulty of the case and the litigant's ability, [the petitioner] could not obtain justice without an attorney, he could not obtain a lawyer on his own, and he would have had a reasonable chance of winning with a lawyer at his side." *Winsett*, 130 F.3d at 281. Furthermore, the court must make a threshold inquiry into whether the petitioner has made a reasonable attempt to obtain counsel on his own. *See id.*; *Pruitt*, 503 F.3d at 654-55.

Smith's motion is a little more than one page, and he states only in general terms that he was unsuccessful in finding an attorney on his own. He does not provide details about who he contacted, when he contacted them, or what information he conveyed. Indeed, it appears that he may not have contacted anyone, and instead assumes that no attorney would take his case because he cannot afford to pay them. (DE 16 at 2.) Smith's subjective belief about the futility of seeking counsel is an inadequate basis to excuse him from trying to obtain counsel on his own. There may be attorneys willing to take his case to fulfill *pro bono* requirements with a law firm or bar association, to gain federal court experience, or simply because they have an interest in the

legal issues raised by his petition. He could not know until he made some effort to obtain counsel on his own. This alone warrants denial of the motion.

Even if the court were to proceed further with the inquiry, Smith has not demonstrated that he "could not obtain justice without an attorney" in this case. *Winslett*, 130 F.3d at 281. To the contrary, Smith has ably represented himself throughout the case, filing a well-drafted petition, and a 40-page traverse containing cogent arguments and citation to relevant legal authority (as well as colorful literary references). He also assembled and submitted more than 100 pages of exhibits for this court's review. The court also considers that Smith competently represented himself in the state post-conviction proceedings, presenting witnesses and evidence at a two-day evidentiary hearing. In short, the court concludes that justice does not require the appointment of counsel in this case. Accordingly, the motion will be denied.

B. Merits

Turning to the merits, all four of Smith's claims are premised on ineffective assistance of his trial counsel. Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009). To prevail on a Sixth Amendment claim, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Richter*, 131 S. Ct. at 788. The court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is

9

raised in a habeas proceeding; "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Furthermore, the court must "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight, " *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010), and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, —U.S.—, 131 S. Ct. 733, 741 (2011).

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Richter*, 131 S. Ct. at 791. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 792. Where it is expedient to do so, the court may resolve an ineffective assistance claim solely on the prejudice prong, because if the petitioner cannot establish prejudice, there is no need to "grade" counsel's performance. *Strickland*, 466 U.S. at 697.

Here, Smith's first three claims are overlapping and can be grouped together; he alleges, in essence, that counsel was deficient in failing to adequately investigate and prepare for trial, and in selecting a defense strategy based on consent rather than pursuing other potential defenses. (DE 1 at 3-6.) In rejecting these claims on post-conviction review, the Indiana Court of

Appeals properly identified *Strickland* as the governing standard, and concluded that Smith failed to establish that he received ineffective assistance of counsel. *Smith*, No. 45A04-1205-PC-264, slip op. at *6-10. Based on the record, the state court's resolution of these claims was not objectively unreasonable.

Under the Sixth Amendment, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S at 690-91. The decision whether to investigate must be assessed for reasonableness based on the circumstances, "applying a heavy measure of deference to counsel's judgments." *Id.* at 691. To establish prejudice in connection with counsel's failure to investigate, the petitioner must make a "comprehensive showing" of what further investigation would have revealed. *United States v. Zillges*, 978 F.2d 369, 373 (7th Cir. 1992). Furthermore, counsel is given significant discretion in selecting a trial strategy based on the information known to him at the time. *See Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011) ("So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel."); *United States v. Lathrop*, 634 F.3d 931, 937 (7th Cir. 2011) (observing that as long as counsel's reasons behind his trial strategy were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient.").

Here, despite Smith's efforts to paint his trial attorney as bumbling and unprepared, the record reflects that counsel thoroughly investigated and ably represented him throughout the case. The facts surrounding counsel's preparation were summarized by the Indiana Court of Appeals as follows, and are presumed correct in this proceeding:

> At the post-conviction hearing, attorney Cantrell testified that he was aware of Smith's proposed defense theories. Smith had provided counsel with a list of potential defense witnesses. Cantrell spoke with a number of these witnesses during his investigation and found them to either lack credibility or not be helpful. Further, after a brief review of a custody file delivered by one of Smith's close friends, Cantrell determined that it was not relevant to the instant case. Cantrell also testified that he met with Smith three or four times in jail. Moreover, Cantrell took a lengthy deposition of M.S. about a month before trial and left "thinking that she was going to come off pretty credible to a jury." After the deposition, Cantrell spoke with Smith about reconsidering his decision to plead not guilty. . . . With respect to two individuals who were trying to provide Cantrell with information to help Smith, Cantrell testified, "I thought both of them were lying through their teeth."
>
> Based upon his investigation and experience, Cantrell testified that he felt the best theory of defense was consent (especially in light of the fact M.S. used a tampon after the alleged rape) and that the alibi and conspiracy theories urged by Smith were, in Cantrell's opinion, not strategically appropriate. With respect to the alibi defense, in addition to noting the DNA evidence, he explained that the timeline of events described by M.S. was not as exact as Smith portrayed and that Smith could have committed the crimes against M.S. and then gone to the various locations in an attempt to establish an alibi. In fact, counsel testified that the suggested alibi defense seemed "pretty ridiculous."
>
> It is evident that trial counsel investigated the theories proposed by Smith and made a strategic decision to reject them.

*Smith*, No. 4504-1205-PC-264, slip op. at *8-9 (internal citations omitted).

It is apparent this was not an easy case to defend in light of the DNA evidence, the testimony of the victim, and the testimony of a bystander that the victim was crying and hysterical with rope still tied around her hands outside of Smith's home. Counsel tried to get Smith to consider pleading guilty, but he declined. Faced with limited options, and based on the information known to him, counsel reasonably decided to forego either the "alibi" or "conspiracy theory" defense Smith suggested. Instead he adopted a defense theory that the victim had consensual sex with Smith, but became upset when the condom they were using broke, and

12

decided to concoct the rape claim to prevent her boyfriend from learning that she had a sexual relationship with Smith.

In hindsight Smith wishes counsel would have adopted a different defense strategy, but the record reflects that counsel was well aware of these other potential defense theories. He just found them untenable based on his professional experience and judgment.[1] His assessment was not unreasonable. Smith wanted counsel to attack the victim's credibility by suggesting she was lying to help Smith's ex-girlfriend with a custody dispute, but counsel felt consent was a stronger defense theory. His strategic decision to focus on one defense theory rather than potentially confusing jurors with alternate theories, or offending them with a far-fetched theory unsupported by convincing evidence, was not unreasonable. Furthermore, to support this theory Smith apparently wanted counsel to introduce evidence that another woman had accused him of rape in the past (in his view, falsely) and then decided not to pursue the charges. The court cannot conclude that counsel acted unreasonably in declining to provide the jury with evidence—which was otherwise inadmissible—that Smith had been accused of raping another woman.

The record further reflects that counsel vigorously pursued the defense theory he selected, making arguments and eliciting testimony from witnesses, including sworn testimony from Smith. There is nothing in the record to reflect counsel "abandoned" Smith as he claims,

---

[1] Counsel testified at the post-conviction hearing that after investigating, his impression was that Smith was "trying to put people up to tell things that weren't true." (PCR Tr., May 10, 2011, at 192.) He recalled speaking with two of Smith's proposed witnesses, who in his view were "clearly lying, and one of them I thought was a drug addict, and I feel, based on where I grew up and the work I've done legal, I know when somebody is under the influence of drugs . . . I would never put her on the stand in a million years." (*Id.* at 188-89.) He further testified that he initially considered pursuing an alibi defense, but found such a defense untenable once the DNA evidence came back inculpating Smith. (*Id.* at 191.) Counsel was also aware of Smith's proposed "conspiracy" theory pertaining to his child custody dispute. (*Id.*) Counsel testified that prior to trial he went to the jail with the custody file to speak with Smith about its relevance to his criminal case per Smith's request; however, he concluded that it was not relevant, and that Smith was trying to use the opportunity to obtain something he was not supposed to have out of the custody file or to improperly communicate with his son. (*Id.* at 180-82.)

13

and the mere fact that counsel did not immediately respond to every letter Smith sent him does not mean he was deficient. As the Indiana Court of Appeals observed, the record reflects that counsel was well-prepared and provided Smith with vigorous representation throughout the trial. Among other things he "filed a motion in limine, made lengthy opening and closing arguments, cross-examined witnesses, asserted many successful objections on Smith's behalf, moved for a directed verdict on three separate ground, and actively defended Smith during the five-day trial." *Id.* at *10.

Although the defense strategy ultimately proved unsuccessful, this cannot be attributed to an error by counsel, but rather to the strength of the evidence inculpating Smith. Based on the record, Smith has not demonstrated that counsel was deficient on any of the above grounds, or that in the absence of some error by counsel, the result of the proceeding would likely have been different. The state court's rejection of these claims was not unreasonable. Accordingly, claims one, two, and three are denied.

Smith's remaining claim is that counsel was deficient in failing to object to certain comments by the prosecutor. (DE 1 at 7.) Each ground of ineffective assistance is considered separate for exhaustion purposes. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). Thus, "the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default." *Id*. As the respondent points out, Smith raised a claim based on trial counsel's failure to object to the prosecutors comments on post-conviction review; however, the Indiana Court of Appeals found this claim waived due to Smith's failure to adequately develop it. *Smith*, No. 45A04-1205-PC-264, slip op. at *11. A federal habeas court will not review a question of federal law if the state decision rested on an adequate and independent state

14

ground for dismissal, including a state procedural rule. *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009). A finding of waiver by the state court is considered an adequate and independent state procedural ground. *Id*. Accordingly, Smith defaulted this claim in the Indiana Court of Appeals. He committed a second level of procedural default when he failed to raise this claim in his petition to transfer to the Indiana Supreme Court. (*See* DE 8-12.) His failure to properly present this claim in one complete round of state review means that it cannot be considered on the merits, absent some basis for setting aside the two defaults.

Smith does not dispute that he procedurally defaulted this claim, and instead suggests at the very end of his traverse that he satisfies the actual innocence exception. (DE 15 at 40.) This is a difficult standard to meet, and it requires him to prove that he is factually innocent of the offenses of which he was convicted, not just that his conviction is legally deficient in some way. *Bousley*, 523 U.S. at 623. He must support his claim of factual innocence with "new reliable evidence," and must show that "in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 537. Smith does not satisfy this demanding standard. He does not fully develop an actual innocence argument in his traverse, but he appears to be basing it on the "alibi" evidence he introduced at his post-conviction hearing. This argument is a non-starter, since Smith admitted at trial that he had sexual intercourse with M.S. on the date in question. He cannot now hinge an actual innocence claim on evidence that directly contradicts his own sworn testimony. Nor would Smith's alibi evidence refute the fact that his DNA was found inside M.S.'s vagina. Furthermore, all of the witnesses at the post-conviction hearing were close friends and family members of Smith, which is significantly less probative than testimony from witnesses with no motive to lie.

*House*, 547 U.S. at 552. Even crediting their testimony, the timeline they described actually confirmed various aspects of the victim's account, specifically, that Smith left the home for a few minutes and returned with his son, then left a second time for a significantly longer period, then returned a third time shortly after she had fled the home.[2] This evidence does not establish Smith's actual innocence.

Smith may also be arguing that he is actually innocent because M.S. had a motive to lie about whether the sex was consensual. However, Smith has not come forward with the type of convincing evidence that would establish his factual innocence. Aside from Smith's unsupported contentions, there is a dearth of evidence showing that M.S. was actually a friend of Smith's ex-girlfriend or that she was involved in any way in the custody dispute. On the other hand, the evidence that Smith raped M.S. is substantial. M.S. testified at trial that Smith held a knife to her throat, choked her, forced her to have oral and vaginal sex with him, and then bound her arms and legs with rope. The jury had the opportunity to observe M.S. and hear her testimony, including her cross-examination by defense counsel, and found her credible. The jury also heard and observed Smith when he testified that the sex was consensual, and they rejected his account. M.S.'s testimony was bolstered by the testimony of a bystander that she was hysterical, hyperventilating, and crying when she flagged down his car outside Smith's home. She still had rope tied around her hands. When M.S. was treated at the hospital she had visible injuries to her

---

[2] The Indiana Court of Appeals summarized the facts on this point as follows: "At the post-conviction hearing, Ruby Matuszak testified that Smith came to her house, which was two houses down from Smith's, at 1:30 to pick up his son. He was there for at most five minutes. Smith's mother and step-father testified that Smith came to their home (about a twenty-minute drive from Smith's home) around 2:10 or 2:20 with their grandson. Smith stopped in briefly to see if someone had dropped off money for him. Several other witnesses testified that they met up with Smith around 3:00 at a friend's house. One of these individuals provided cash to Smith in exchange for Smith's social security check." *Smith*, No. 45A04-1205-PC-264, slip op. at *7 n.3.

16

neck, hands, and ankles, consistent with the events she described. In short, Smith fails to establish that he meets the actual innocence exception. He has not provided any other grounds for excusing his procedural defaults and, therefore, his claim cannot be considered on the merits. Accordingly, the petition must be denied.

    C.    Certificate of Appealability

As a final matter, the court must consider whether to grant Smith a certificate of appealability. 28 U.S.C. § 2253(c); RULE 11 OF THE RULES GOVERNING SECTION 2254 CASES. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the petition is resolved on procedural grounds, to obtain a certificate of appealability the petitioner must establish two components: that reasonable jurists would find it debatable whether the court was correct in its procedural ruling, and that the petition states a valid claim for denial of a constitutional right. *Id.* For the reasons fully explained above, Smith's claims are either without merit or procedurally defaulted. He has not provided any basis for concluding that jurists of reason would debate the outcome of the petition or find a reason to encourage him to proceed further. Accordingly, the court declines to issue him a certificate of appealability.

III.     CONCLUSION

For the reasons set forth above, the petitioner's motion for appointment of counsel (DE 16) is DENIED. The petition (DE 1) is DENIED. The petitioner is DENIED a certificate of appealability.

SO ORDERED.

ENTERED: February 20, 2014

 s/William C. Lee  
William C. Lee, Judge  
United States District Court